# UNITED STATES DISTRICT COURT

ORIGINAL

FILED

_____SOUTHERN_____ DISTRICT OF _____CALIFORNIA_____

2008 MAY 21  AM 8:59

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____YNH_____DEPUTY

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

**1307 El Corral Lane
San Marcos, California**

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

**CASE NUMBER:** '08 MJ 1577

I, __John Gieson__ , being duly sworn depose and say:

I am a(n) _Special Agent of the Drug Enforcement Administration_ and have reason to believe that ___ on the person of or _X_ on the property or premises known as (name, description and/or location)

**1307 El Corral Lane, San Marcos, California**

in the _____SOUTHERN_____ District of _____CALIFORNIA_____

there is now concealed a certain person or property, namely (describe the person or property)

**See Attachment A**

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

Evidence of the commission of a criminal offense

concerning a violation of Title _21_ United States Code, Section(s) _841(a)(1) and 846_ .

The facts to support a finding of Probable Cause are as follows:

**See Attached Affidavit.**

Continued on the attached sheet and made a part thereof. _X_ Yes ___ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

_5/7/08_ at _San Diego, CA_
Date      City and State

LOUISA S. PORTER
U.S. MAGISTRATE JUDGE
_____
Name and Title of Judicial Officer    Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF APPLICATION OR SEARCH WARRANT

I, John J. Gieson, being duly sworn, declare and state:

## I

## BACKGROUND AND EXPERIENCE

1.      I am a Special Agent of the United States Department of Justice, Drug Enforcement Administration (DEA), and have been so employed since September 1998. I am presently assigned to the San Diego Field Division, Narcotic Task Force Team 6 (NTF), and have been so since April 1999. I have received formal training in illicit controlled substance investigations in San Diego County and surrounding areas. I have had formal training and experience in controlled substances investigations; I have become familiar with the manner in which controlled substance investigations, including marijuana, are packaged, marketed, cultivated and consumed. I have received training in the identification of all types of controlled substances by sight and odor, including marijuana. I have participated in hundreds of arrests for controlled substances violations. In the course of my present duties, I have become familiar with the manners and techniques of traffickers in controlled substance as practiced locally. I have served or assisted in the service of over 100 search warrants wherein all types of controlled substances, including marijuana, were seized.

2.      In January 1999, I completed a 17-week Basic Agent's School at the FBI Academy in Quantico, Virginia, which included training in the manufacture, cultivation, distribution, and abuse of all types of controlled substances. In April 2000, your affiant completed the 2-week Clandestine Laboratory Investigation Course at the FBI Academy in Quantico, Virginia, which was conducted by DEA. Your affiant has received more than 100 hours of instruction in conducting indoor/outdoor cannabis investigations. Currently, your affiant serves as DEA's San Diego Division, Domestic Cannabis Eradication/Suppression Program Coordinator. Your affiant is responsible for coordinating the marijuana eradication efforts in San Diego and Imperial Counties. Your affiant has personally assisted in the eradication of more than 300,000 marijuana plants. Your affiant has also performed the following duties: (1) acted as case agent organizing drug investigations; and (2) debriefed numerous informants and defendants regarding marijuana cultivation and distribution.

3.     In preparing this affidavit, I have conferred with other special agents and law enforcement officers who have experience conducting investigations regarding the cultivation of marijuana. Furthermore, I have personal knowledge of the following facts or have been informed of them by others.

**II**

**LOCATIONS TO BE SEARCHED**

4.     This affidavit is submitted solely for the purpose of establishing probable cause to search each premises located at (1) 1307 El Corral Lane, San Marcos, California (hereinafter **"1307 El Corral Lane"**) and, (2) 644 Corte Galante, San Marcos, California (hereinafter **"644 Corte Galante"**), including all attached and unattached rooms, attics, basements, garages (including vehicles parked therein), storage areas, safes, briefcases, containers, trash areas within the residence, surrounding grounds and outbuildings assigned to or part of the location. Each location is further described in Attachment A.

5.     This affidavit does not contain all of the information known to law enforcement regarding this investigation, but rather contains only those facts believed to be necessary to establish probable cause that evidence of marijuana cultivation and or money laundering will be found at the above premises.

6.     I submit that the facts contained in this affidavit demonstrate that there is probable cause to believe that evidence of violation of Title 21, United States Code, Section 841(a)(1) (manufacture of a controlled substance, to wit, marijuana and marijuana plants) and/or Title 18, United States Code, Section 1956 (money laundering), including items listed in Attachment B, will be found at **1307 El Corral Lane** and **644 Corte Galante.**

**III**

**FACTS ESTABLISHING PROBABLE CAUSE**

**BACKGROUND OF INVESTIGATION**

7.     On January 15, 2008, Special Agent Harrison (IRS) and I interviewed a source of information (hereinafter "SOI#1") who related Shaun Fitch operates a clandestine indoor marijuana grow house and possibly a second location. The last time the SOI#1 had been to Shaun Fitch's house and

2

witnessed the growing of the marijuana plants was around April of 2007. The SOI#1 did not know the exact address of the marijuana grow location but described the location as being in the Lake San Marcos area of San Marcos. The SOI#1 has not been to the second location but believed it was also in the Lake San Marcos area. The SOI further related that Shaun Fitch is known to sell quantities of cocaine. I identified Shaun Fitch as having a date of birth of June 30, 1982. On January 25, 2008, I showed a California Department of Motor Vehicle photo of Shaun Fitch to the SOI#1. The SOI#1 positively identified Shaun Fitch as the person he described above. The SOI#1 further identified **1307 El Corral Lane** as Shaun Fitch's residence being used to cultivate marijuana as described above.

8.     The SOI#1 is currently facing charges in an open criminal prosecution, but has agreed to cooperate with law enforcement. No promises have been made to the SOI#1 in exchange for her/his cooperation other than the amount and degree of the cooperation will be made known to the prosecutor, who may then be inclined to recommend some kind of sentencing consideration. The SOI#1 has entered a guilty plea in federal court involving the laundering of drug proceeds (with a 20 year maximum) and is awaiting sentencing. Despite these pending charges, I believe the SOI#1 information is accurate because the information given to me was subsequently corroborated by other law enforcement sources and me.

9.     I desire to keep the SOI#1 confidential because she/he has requested me to do so, because it is my training and experience that such SOI#1's suffer physical, social or emotional retribution when their identities are revealed; because it is my experience that to reveal the identity of such SOI#1's seriously impairs their utility to law enforcement; and because it is my experience that revealing the identity of such SOI#1's dissuades other citizens from disclosing confidential information about criminal activities to law officers. The SOI#1 is not a percipient witness of any of the below events.

## 1307 EL CORRAL LANE INVESTIGATION

10.     Real estate records indicate Shaun Fitch is the current owner of 1307 El Corral Lane since April 11, 2006 to the present. This residence is located within a community in Lake San Marcos.

11.     I reviewed subpoenaed records from San Diego Gas & Electric (hereinafter "SDG&E") which show that Shaun Fitch is the current utility subscriber at 1307 El Corral Lane, and has been since April 20, 2006 to the present.

12.     The following table shows the electrical usage history, in kilowatt-hours per month, at 1307 El Corral Lane, along with four comparable neighborhood residences.  I have personally seen these residences used for comparison purposes in the neighborhood and they appear to be similar in size and construction to the residence at 1307 El Corral Lane.

## AMOUNT OF KILOWATTS UTILIZED

| DATE | 1307 El Corral | 1302 El Corral | 1313 El Corral | 1317 El Corral | 1326 El Corral |
|------|------|------|------|------|------|
| 04/08 | 2394 | 444 | 238 | 334 | 247 |
| 03/08 | 2424 | 554 | 246 | 334 | 277 |
| 02/08 | 2225 | 620 | 249 | 324 | 311 |
| 01/08 | 2358 | 506 | 208 | 305 | 320 |
| 12/07 | 2568 | 649 | 280 | 358 | 412 |
| 11/07 | 2494 | 526 | 230 | 422 | 280 |
| 10/07 | 2126 | 438 | 204 | 353 | 274 |
| 09/07 | 1942 | 481 | 428 | 379 | 359 |
| 08/07 | 1692 | 534 | 458 | 390 | 299 |
| 07/07 | 1478 | 640 | 349 | 524 | 292 |
| 06/07 | 420 | 380 | 183 | 376 | 248 |
| 05/07 | 1721 | 407 | 162 | 383 | 274 |
| 04/07 | 1717 | 424 | 203 | 408 | 243 |
| 03/07 | 1061 | 381 | 190 | 377 | 222 |

| 02/07 | 1798 | 394 | 222 | 408 | 255 |
| 01/07 | 1385 | 446 | 275 | 440 | 331 |

13. Based on my training and experience, it is my opinion that the electrical usage at **1307 El Corral Lane** shows high energy use that is consistent with the amount of electricity required to operate the equipment commonly used for indoor marijuana cultivation, namely, but not limited to, high wattage lights, circulation fans, exhaust blowers, and pump systems. I observed nothing from the outside of the structure that could lead me to account for the high electrical usage.

14. Independent from this investigation, on January 22, 2004, the DEA received information from another source of information (hereinafter "SOI#2"). SOI#2 stated that Shawn Fitch (father of Shaun Fitch) was trafficking marijuana in the San Diego area and that the marijuana was possibly being stashed at the residence of his son, Shaun Fitch. As a result of the information from SOI#2, agents conducted a cursory investigation and confirmed their identities (Shawn and Shaun Fitch) but there was no narcotic seizures or arrests stemming from SOI#2's information in 2004.

15. On January 29, 2008, a magnetic Global Positioning System (GPS) vehicle tracker was placed on a 2007 White Mitsubishi Raider pick up, bearing California license plate 8A38446, which is registered to Shaun Fitch and Adam Fitch at 16507 Dove Canyon Road Apt. 8207, San Diego (hereinafter "Mitsubishi Pick-up"). Based on the investigation, Adam Fitch is the brother of Shaun Fitch. The GPS tracker was placed on the Mitsubishi Pick-Up while it was parked in a public parking lot. Subsequent battery changes of the magnetic GPS vehicle tracker took place while the Mitsubishi Pick-Up was parked in a public place or in front of or in the driveway of **644 Corte Galante**. The driveway entrance to **644 Corte Galante** is not gated and there is no signage denoting "no soliciting" or "no trespassing." The GPS tracker placed on the Mitsubishi Pick-up showed that Shaun Fitch and Adam Fitch likely reside at **1307 El Corral Lane** because the Mitsubishi Pick-up returns to **1307 El Corral Lane** on most nights. However, the GPS tracker also showed that the Mitsubishi Pick-up frequently traveled to the area of **644 Corte Galante**, which I believe is a marijuana grow location, and would eventually return to **1307 El Corral Lane**. When conducting physical surveillance in conjunction with the GPS tracker on multiple occasions, I and other agents have observed Adam Fitch as the primary driver of the Mitsubishi Pick-up while Shaun Fitch has been the passenger. I believe Adam Fitch is the

primary driver because Shaun Fitch was arrested on January 21, 2008, for driving under the influence of alcohol, and his driver's license was suspended.. Below is a chart depicting information received from the GPS tracker on Mitsubishi demonstrating that they frequently travel between **1307 El Corral Lane** and **644 Corte Galante** [1]/ which I believe is a marijuana grow location as further discussed below.

| MONTH | # OF TIMES TRAVELED TO THE AREA OF 644 CORTE GALANTE | # OF DAYS TRACKED IN MONTH |
|---|---|---|
| February | 17 | 18 |
| March | 49 | 21 |
| April | 4 | 2 |

16.    In addition, I believe that Shaun Fitch and Adam Fitch frequents **1307 El Corral Lane** and **644 Corte Galante** properties because in my training and experience, indoor marijuana cultivation operations require regular maintenance to ensure that the marijuana plants are growing healthy and that the equipment (such as lights, fans, irrigation systems, etc.) is operating properly.  Some marijuana grows require daily maintenance, while other grows require maintenance 2-3 times each week.  If a malfunction occurred with any equipment and the problem was not rectified immediately, it would effect the growth of the marijuana plants resulting in the ultimate loss of product and therefore decreasing the profitability.

17.    The tracker battery on the Mitsubishi died on April 2, 2008. Since then agents have been unable to locate the Mitsubishi Pick-up. California Department of Motor Vehicles indicate that the Mitsubishi Pick-up was being re-registered as of April 4, 2008, but the registration is being delayed because DMV needs a certificate of cost and weight change paperwork. During this time frame, agents have observed Shaun Fitch and Adam Fitch in a Mitsubishi Gallant bearing 5KRH675 registered to

---

[1]/    This chart does not represent all of the information gathered from the tracking device that was on the Mitsubishi but only the information necessary to establish probable cause for the locations being searched.

David Ordway (hereinafter "Mitsubishi Gallant") at 7712 Corte Violeta Carlsbad. Information received from the tracker on the Mitsubishi Pick-up showed that during February and March of 2008, the Mitsubishi Pick-up frequented the area of 7712 Corte Violeta. On numerous occasions agents have observed the Mitsubishi Pick-up parked in front of 7712 Corte Violeta and observed Shaun Fitch entering and exiting the residence at 7712 Corte Violeta.

18.     Based on my training and experience, it is common for persons who operate clandestine indoor marijuana cultivation operations to maintain marijuana grows at other locations (in addition to their own residence).

19.     On April 28, 2008, I applied for and was granted State of California scan warrant #234-08 by San Diego County Superior Court Judge David Danielson, authorizing a Forward Looking Infrared (FLIR) scan of **1307 El Corral Lane**. This device is a passive, non-intrusive system which detects differences in temperature of an object being observed. This system does not send any beams or rays into an area, nor does it enter any structured area. The system only detects differences in the surface temperatures of an object. The use of this device in the early morning or late evening hours, without solar loading (sunshine), will highlight man-made heat sources as a white color and cooler temperatures by shades of gray. Similar devices such as this have been used with other applications such as locating missing persons in a forest, identifying inefficient building insulations, detecting hot overloaded power lines, and detecting forest fire lines through smoke.

20.     On April 29, 2008, pursuant to the state FLIR scan warrant, San Diego Police Officer Todd Jager, who is assigned to the San Diego Police Department's aviation unit as a Tactical Flight Officer (TFO), conducted this FLIR. Officer Jager is also a certified thermographer. I have been advised of the qualifications of Officer Jager as described in Attachment C, which is filed in conjunction herewith and incorporated by reference herein. After reviewing the video of the FLIR, Officer Jager

opined that there was an unusual amount of heat emitting from some sections of the roof. There was also an unusually warm section at the peak of one end of the roof. There was further a specific source of heat on the roof that looked like intentional heat venting. Officer Jager concluded that these types of heat anomalies to be consistent with that of an indoor marijuana cultivation operation.

## 644 CORTE GALANTE INVESTIGATION

21.    I reviewed subpoenaed records from SDG&E which show that Danielle Lynch is the current utility subscriber at **644 Corte Galante**, and has been since January 21, 2008 to the present. Based on the SOI#1's information and agents surveillance observations, Danielle Lynch has been identified as the girlfriend of Shaun Fitch.

22.    The following table shows the electrical usage history, in kilowatt-hours per month, at **644 Corte Galante**, along with four comparable neighborhood residences. I have personally seen these residences used for comparison purposes in the neighborhood and they appear to be similar in size and construction to the residence at **644 Corte Galante**.

### AMOUNT OF KILOWATTS UTILIZED

| DATE | 644 **Corte Galante** | 612 Corte Galante | 634 Corte Galante | 635 Corte Galante | 643 Corte Galante |
|---|---|---|---|---|---|
| 04/08 | 1667 | 436 | 287 | 406 | 316 |
| 03/08 | 2063 | 454 | 339 | 399 | 289 |
| 02/08 | 862 | 483 | 361 | 447 | 340 |
| 01/08 | 91 (14 days) | 488 | 384 | 465 | 393 |

23.    Based on my training and experience, it is my opinion that the electrical usage at **644 Corte Galante** shows high energy use that is consistent with the amount of electricity required to operate the equipment commonly used for indoor marijuana cultivation, namely, but not limited to, high wattage lights, circulation fans, exhaust blowers, and pump systems. I observed nothing from the outside of the structure that could lead me to account for the high electrical usage.

24.    On February 8, 2008, a magnetic Global Positioning System (GPS) vehicle tracker was placed on a 2004 White Toyota Tacoma up bearing California license plate 7N19882, registered to

Jennifer Prudham at 15104 Ayers Lane, Valley Center (hereinafter "Lynch's truck"). Jennifer Prudham is believed to be the mother of Danielle Lynch. The GPS tracker was placed on Lynch's truck while it was parked in a public parking lot. Subsequent battery changes of the magnetic GPS vehicle tracker took place while Lynch's truck was parked in a public place or in the driveway of **644 Corte Galante**. The GPS tracker on Lynch's truck shows that Danielle Lynch reside at **644 Corte Galante** because the truck returns to the address every night. However, the GPS tracker also showed that Lynchs' truck frequently traveled to the area of **1307 El Corral Lane** and would eventually return to **644 Corte Galante**. When conducting physical surveillance in conjunction with the GPS tracker, on multiple occasions, I and other agents have observed Danielle Lynch as the primary driver of the Lynch's truck but Shaun Fitch has been also been observed driving Lynch's truck. Below is a chart depicting information received from the GPS tracker on Lynchs' truck demonstrating that it frequently travel between **1307 El Corral Lane** and **644 Corte Galante** [2] which I believe both residences are being used to clandestinely cultivate marijuana.

| MONTH | # OF TIMES TRAVELED TO THE AREA OF 1307 El CORRAL LANE | # OF DAYS TRACKED IN MONTH |
|---|---|---|
| February | 21 | 20 |
| March* | 0 | 10 |

* Tracker was removed from vehicle on March 17th. According to California Department of Motor Vehicles on March 30, 2008, Daniel Lynch purchased a 2004 BMW convertible bearing California 5KFD971. Since then agents have not seen Lynch's truck as described above but have observed Danielle Lynch driving the 2004 BMW.

25.    On February 13, 2008, at approximately 11:54 a.m., the GPS tracker indicated that Lynch's truck was in the area of Greentrees Hydroponics located at 2581 Pioneer Avenue Unit D, Vista, CA. Greentrees Hydroponics has been identified by the DEA as selling equipment used in the

[2] This chart does not represent all of the information gathered from the tracking device that was on Lynchs' truck, but only the information necessary to establish probable cause for the locations being searched.

9

cultivation of marijuana. At 11:59 a.m., the vehicle departed the area. At 12:23 p.m., I located Lynch's truck parked at a grocery store in San Marcos. I walked up to the vehicle and looked inside and observed two boxes and flexible metal type air ducting in the back seat. I recognized this type of air ducting as the same type that is commonly used in the cultivation of marijuana to vent excessive heat generated from the grow lights. Inside the grocery store, I observed Danielle Lynch, Shaun Fitch, and Adam Fitch. At approximately 12:33 p.m., the three entered Lynch's truck and departed. I followed Lynch's truck directly to **644 Corte Galante** where I observed Danielle Lynch and Adam Fitch bring the boxes and ducting in to the residence.

26.    On February 14, 2008, at approximately 11:35 a.m., a DEA agent acting in an undercover capacity telephoned Danielle Lynch at telephone number (858) 353-5239. This telephone number has been subscribed to Danielle Lynch since March 30, 2006. Danielle Lynch provided the telephone company with a billing address of **644 Corte Galante**. During the conversation, the agent advised Lynch that the agent was interested in purchasing narcotics. Lynch advised the agent that she needed to talk to some people. Lynch asked the agent if he was looking for the "golf balls" or the "green shirts." Based on the agents training and experiences as an undercover agent, he believes the "golf balls" refer to a quantity of cocaine and "green shirts" refers to an unknown quantity of marijuana. The agent advised Lynch that he was looking for a connection that could provide both types of narcotics. Lynch advised the agent that she would need a couple days to organize things and told the agent to call Lynch back in a couple days. In a few days, the agent telephoned Danielle Lynch who told the agent that she would not be able to sell the agent any narcotics.

27.    On April 28, 2008, I applied for and was granted State of California scan warrant #235-08 by San Diego County Superior Court Judge David Danielson, authorizing a Forward Looking Infrared (FLIR) scan of **644 Corte Galante**.

10

28.    On April 29, 2008, pursuant to the state FLIR scan warrant, San Diego Police Officer Todd Jager conducted this FLIR. After reviewing the video of the FLIR, Officer Jager was not able to detect any other heat anomalies that would indicate the presence of an indoor marijuana grow. Officer Jager concluded that the FLIR scan was inconclusive as to the presence of an indoor marijuana grow.

29.    Although the FLIR scan did not detect sufficient heat anomalies associated with indoor marijuana cultivator, it does not preclude the possibility the house is being used to cultivate marijuana especially given the high electricity usage combined with the other factors stated above. Based on my training and experience, marijuana cultivators are often aware of the techniques and tools used by law enforcement to detect their marijuana cultivation operations. They learn these techniques from other marijuana cultivators and trade publications such as "High Times" magazine. For example, they are told not to discard the unused portions of the marijuana plant in their trash because they know law enforcement conducts trash searches. When purchasing equipment from hydroponic stores, they are told to use different vehicles and not to drive directly back to their marijuana cultivation location because law enforcement conducts surveillance at these hydroponic stores. Likewise, they are also taught ways of defeating the FLIR scans. For example, marijuana cultivators may operate their heat generating equipment during the day-time hours when FLIR scans can not be used. Marijuana cultivators can also insulate the rooms that are being used. They can also direct the venting to other locations, such as a fireplace chimney.

30.    Documents and business records are frequently maintained by those engaged in the "business" of manufacturing and selling controlled substances. Also, those so engaged will frequently maintain writings, books, business ledgers, lists, notations, and other memoranda to assist them in their criminal enterprises. These materials are created and maintained in much the same way and for the same reasons as persons involved in legitimate business keep similar materials. These documents and business records are frequently kept at the residence that they actually live in. This is done to protect their

discovery and seizure by law enforcement if the location being used to cultivate marijuana is raided by law enforcement.

31.    Based on my training and experience, I know that persons who are involved in the cultivation of marijuana become involved in the process over an extended period of time because the indoor cultivation and distribution of marijuana is an ongoing process.

32.    I know through my training and experience that indoor marijuana cultivation primarily requires the use of hydroponics equipment such as lava rock in lieu of traditional soil methods. The term hydroponics refers to the cultivation of plants by placing the roots in liquid nutrient solutions rather than soil. To conduct this type of cultivation, the following equipment is required; rockwool also known as GroDan (a fibrous material used as a rowing medium and substituted for soil; high intensity lights, nutrients, fertilizers; various types of fans, tables, and trays that are specifically designed to facilitate the irrigation of plants; $CO_2$ enrichment systems; electrical timers, and other items that allow for optimum growing conditions.

33.    I am also aware that indoor cultivators generally utilize a technique known as "cloning" to produce additional plants from clippings from a "mother plant." These clippings are genetically identical to the mother plants. This allows the cultivator to take cuttings from a female plant and ensure the cuttings will develop identical female plants. This type of cultivation produces a seedless marijuana plant known as "Sinsemilla," which has a very high street value and worthy of this expensive investment. In addition, this allows for what is normally an annual plant to be grown year round (three to four crops a year indoors). The cloning process allows for the cultivator to operate on an ongoing basis, capable of producing very high quality marijuana throughout the year. This is further made possible by the utilization of indoor lighting, which, by adjusting the light cycle, allows the cultivator to extend the growing cycle of "mother plants" indefinitely.

34.    The most common method of growing marijuana indoors is by utilizing hydroponics which refers to the growing of plants in nutrient solution with or without an inert medium, to provide mechanical support. This growing medium is often referred to as GroDan or rockwool and is commercially available. Cultivators will take small cuttings (known as clones) from large female marijuana plants and place them into small cubes or rockwool. These clones will be placed in various

specially made tables or trays where water, containing all of the vital nutrients that soil normally contains, will saturate the clones. The water is stored in a reservoir and pumped into the trays containing the plants and automatically drains back into the reservoir.

35.    The clones are then placed under high intensity lights ranging from 150 to 400 watts. The lights are generally placed on a timer for 18 hours in a 24-hour period to allow for the plants to acquire a vegetable growth. In approximately 7-10 days the clones will begin to form roots. As the plants continue to grow, a higher intensity light is required to obtain optimum light conditions. Cultivators will use 400 watt and up to 1000 watt lights to provide the plants with enough light to grow as if they were outside. These lights use large quantities of electricity. As an example, each 400 watt light adds approximately $25 and each 1000 watt light adds $54 to monthly utility bills.

36.    These lights are often mounted on a mechanical track which allows the lights to slowly move across the plants providing an equal amount of light to all of the plants. Cultivators have been known to mount a multitude of these lights into an enclosed room. This creates tremendous amounts of heat. In some cases, additional equipment is required such as oscillating fans to cool the room and to exercise the plants. CO2 (carbon dioxide) systems are installed to create optimum air conditions for the plants. The CO2 systems allow for optimum plant development and, when properly installed, cultivators can achieve a significant productivity increase from their plants. Ultimately the cultivators are striving to produce colas, the flowering tops of the marijuana plants where the tetrahydrocannabinol (THC) is mostly concentrated.

37.    In approximately 8 to 10 weeks the cultivator will program the lights to be on 12 hours a day, allowing for 12 hours of darkness. The plants are once again tricked into sensing a seasonal change and they will spend 70 percent of their energy into producing colas for the reproduction. Since the plants are never being exposed to male plants, they will not be pollinated and will not produce seeds (hence the term sinsemilla which means "without seeds." The flowering tops of the marijuana plants are known to cultivator as "buds" and are extremely potent in their THC content. The cultivation of indoor marijuana is a very unique process in that it allows for the cultivator to operate on an ongoing basis that yields a very high quality product.

13

38.    It should be noted that I have been the case agent or assisted other case agents in the investigation and successful prosecution of over 50 indoor marijuana cultivation operations. Based on both SOI's statements followed up by extraordinary electrical usage, the results of the GPS tracker information, physical surveillance observations of Shaun and Adam Fitch, high heat anomalies from the FLIR scan of **1307 El Corral Lane**, and other evidence, both locations are consistent with that of a clandestine indoor marijuana cultivation operation and I believe that there will be evidence listed in Attachment B will be found at these locations. In addition, I believe that evidence contained in Attachment B, such as documents and records related to the manufacturing of marijuana and evidence of money laundering, will be found at **1307 El Corral Lane and 644 Corte Galante**.

39.    In my experience, documents and business records are frequently maintained by those engaged in the "business" of manufacturing and selling controlled substances. Also, those so engaged will frequently maintain writings, books, business ledgers, lists, notations, and other memoranda to assist them in their criminal enterprises. These materials are created and maintained in much the same way and for the same reasons as persons involved in legitimate business keep similar materials. These documents and business records are frequently kept at the residence that they actually live in. This is done to protect their discovery and seizure by law enforcement if the location being used to cultivate marijuana is raided by law enforcement.

40.    In addition, I believe that Shaun Fitch, is involved in money laundering related to the proceeds of his drug trafficking activities (manufacturing of marijuana plants), in violation of Title 18, United States Code, Section 1956. I know from prior and recent investigations that managers of marijuana grow operations make substantial profits from their marijuana grows. In one case, the manager who operated two large marijuana grow locations made $80,000 each month.

41.    Subpoenaed records from the California Employment Development Department (EDD) show that:

•    Shaun Fitch last reported wages earned from an employer in the fourth quarter of 2004. Shaun has not filed for unemployment or disability. No other sources of income, except for marijuana cultivation, has been uncovered during the investigation of Shaun Fitch

14

- Adam Fitch last reported wages earned from an employer in the third quarter of 2004. Adam has not filed for unemployment or disability. No other sources of income, except for marijuana cultivation, has been uncovered during the investigation of Adam Fitch

42. It is my experience that individuals that operate indoor marijuana grow operations do not have legitimate employment, the profits reaped from growing and selling marijuana are enormous and the maintenance that is required to run multiple marijuana grow operation does not allow for an individual to have enough time to work a legitimate job.

43. In March 2006, Shaun Fitch filled out a loan application to purchase **1307 El Corral Lane**. In that application, Shaun Fitch listed that he has been employed by Mortgage 2000 as a loan consultant for the previous two years, and that his monthly income from Mortgage 2000 is $9,700 per month ($116,400 per year). On April 28, 2008, IRS Special Agent Harrison called Mortgage 2000 to inquire about the office location and hours of the branch of Mortgage 2000 that Shaun Fitch listed being employed by, and the individual that answered the phone told Agent Harrison that the branch has been closed for over one year. Shaun Fitch purchased **1307 El Corral Lane** for $478,000 with a down payment of $57,432.99. Shaun Fitch listed that he would be using his checking and savings accounts as the source of down-payments. After reviewing the loan file it was determined that Shaun Fitch used his money for less than one half of the down payment. A $35,000 cashiers check was deposited into the escrow account for the purchase of the residence was drawn on the savings account of an individual named John Coelho (agents do not know the connection with Coelho and Shaun Fitch). Coelho did not sign any of the real estate documents. The purchaser of a cashiers check for the remaining $22,432.99 cashiers check that was deposited into escrow appears to Shaun Fitch.

44. I believe that in an attempt to legitimize his drug proceeds, Shaun Fitch lied on his mortgage loan application by stating that he currently earns $116,400 per year while working at Mortgage 2000 in Temecula, CA. In my experience individuals that are growing and distributing marijuana and want to purchase property need to list current employment on loan applications and frequently utilize a business where they have a friend or associate employed that can falsely verify their employment status.

46.    IRS Agent Harrison reviewed the payment methods used by Shaun Fitch to pay his mortgage and the review revealed that Shaun Fitch frequently uses online bill payment to make payments to Washington Mutual on his loan. I believe that Shaun Fitch may use his computer to assist him in paying other expenses as well. Also, In previous marijuana grow cases I have found that it is common for marijuana growers to take pictures of their grows to show others involved in cultivating marijuana. Therefore, I believe that evidence of money laundering and marijuana cultivation may be found on computers being used by Shaun Fitch. I request to seize any computers at the residence and will apply for a separate search warrant to forensically download the contents of the computers.

### BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

47.    Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all the facts and opinions set forth in this affidavit, I know that:

a.    Individuals involved in growing/dealing marijuana will often maintain at their residence and other buildings and/or vehicles on their residential property, laboratory equipment, chemicals used to manufacture controlled substances, quantities of controlled substances, as well as paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.

b.    Individuals involved in drug dealing and drug manufacturing often maintain at their residence, and other buildings and/or vehicles on their property, records and ledgers evidencing their trafficking activities in order to keep track of the manufacturing, ordering, purchasing, storage, distribution and transportation of chemical, laboratory equipment and/or drugs. At times, the drugs may be sold, but documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records are often maintained not only on paper, but also as computer data in the form of computer hardware and software.

c.    Individuals involved in drug dealing and drug manufacturing must often rely on others to obtain the drugs and to help them market the drug and evidence of the identities of these

criminal associates is often maintained at their residence, and other buildings and/or vehicles on their residential property.

        d.      Based on prior scans of premises used by individuals involved in drug dealing and drug manufacturing, I believe I will find articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

        e.      Individuals involved in drug dealing and drug manufacturing will often conceal evidence of their drug dealing in vehicles outside their residence in order to prevent detection and seizure by officers conducting search warrants at the residence. Therefore, I am requesting permission to search vehicles parked at or near the above-described location provided it can be connected to an occupant of the premises by way of admissions, keys, photographs, Department of Motor Vehicles documents, insurance papers, or repair receipts.

        f.      Individuals involved in drug dealing and drug manufacturing, earn sums of money and often try to legitimize these profits. In order to do this they attempt to secret, transfer and conceal the money by, among other ways: (1) placing assets in names other then their own to avoid detection while maintaining control; (2) laundering the money through what appears to be a legitimate business or businesses; (3) hiding money in their homes, business locations, safes and safety deposit boxes; or (4) using the money to buy assets which are hard to trace. Records of these transactions are often found at their residence, and other buildings and/or vehicles on their residential property.

        g.      Individuals involved in drug dealing or drug manufacturing will often maintain weapons, firearms and ammunition on their person or at their residence and cars in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during their drug dealings. These weapons and firearms are used and can be used as an instrumentality of the crime of possession and distribution of drugs. Therefore, I am requesting permission to seize weapons, firearms and ammunition that may be found at the above-described target location.

        48.      It is also my opinion and belief that the above-described documents are currently possessed by drug dealers/manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date.

1  These documents are kept by drug dealers/manufacturers whether or not the dealer/manufacturer is in

2  possession of any drugs/chemicals at any given moment. I believe that the seizure of such documents

3  will provide evidence of the events set forth in this affidavit and that such documents can be found at

4  the target location despite any lapse of the time between the events described and the anticipated scan

5  pursuant to this warrant.

6       49.    Based upon the foregoing facts, the affiant has reason to believe that the items identified

7  in Attachment B will be found at **1307 El Corral Lane** and **644 Corte Galante**.

8       50.    Because this is an ongoing investigation, I request that the affidavit remain sealed under

9  further order of the Court.

10

         John Gieson, Special Agent

11          Drug Enforcement Administration

12

Subscribed and sworn to before me this _____ day of May, 2008.

13

14

15          UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

**Attachment A**

1307 El Corral Lane San Marcos, is further described as a single-story, single-family residence having white colored shingles with blue colored wood trim and having the numbers "1307" to the left of the garage door.



## ATTACHMENT B

1. Documents relating to or memorializing the cultivation and distribution of marijuana, including U.S Currency, buyer lists, seller lists, pay-owe sheets, records of sales, log books, drug ledgers, computers and computer equipment, computer software, personal telephone/address books, including electronic organizers, rolodexes, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records.

2. Articles of personal property relating to the existence of a scheme to cultivate and distribute marijuana, including personal telephone/address books, including electronic organizers, telephone bills, photographs, and papers and documents containing lists of names and/or numbers of individuals involved in the possession and sale of marijuana.

3. Documents and articles of property relating to the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, door locks, rental agreements and records, property acquisition records, utility and telephone beepers or paging devices, rolodexes, telephone answering pads, storage records, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit records, canceled checks, and other records of income and expenditure, credit card and bank records, travel documents, personal identification documents, and documents relating to obtaining false identification, including birth certificates, drivers license, immigration cards and other forms of identification in which the same person would use other names and identities other than his or her own.

4. Equipment used to cultivate marijuana, marijuana plants, processed marijuana, as well as paraphernalia for packaging, weighing, cutting, testing, distributing and identifying controlled substances; any other narcotic substances.

5. Weapons and/or firearms.

6. Documents and records including income tax returns (including Forms 1120, 1120S, 1065, 1040, 940, 941, DE-3); income tax information documents (including Forms 1099, W-2, W-4, K-1); supporting work papers, summary sheets and analyses; documents relating to any corporate audits; corporate journals (including general journals, cash receipts journals, cash disbursement journals, sales journals, purchase journals and payroll journals); general and subsidiary ledgers (including payroll, accounts receivable, accounts payable, purchases); chart of accounts, adjusting and closing entries, year end trial balances, corporate minutes, bylaws and Articles of Incorporation; employee lists

and employee contracts; documents showing the receipt or disbursements of cash (including records of royalties, credit card statements and receipts, invoices, records of commercial storage, cash reconciliation's, and records regarding any purchase or sale of assets); loan documents to or from shareholders and related entities with payment history; other loan documents; inventory records; financial statements; contracts (including contract bids and proposals); mortgage records or other documentation supporting conveyances and/or ownership of property; documents and records relating to other corporations, limited liability companies, partnerships and other entities which have related ownership.

7.    Records related to their banking activity (including bank statements, check registers, passbooks, deposit and withdrawal slips, cancelled checks, certificates of deposit, notes, account applications, negotiable instruments, safety deposit box records and keys, money drafts, letters of credit, money orders, cashiers' checks and receipts for same, bank checks, wire transfers and bank reconciliations); computers.

8.    Records also include audio recordings, video recordings, telephone answering machine recording, memoranda, correspondence, diaries, notes, address books, day planners, calendars, appointment books, newspaper clippings, articles, books, financial institution records, checks, cashiers' checks, money orders, wire transfer records, deposit slips, ATM receipts, certificates of deposit, safety deposit slips, withdrawal slips, monthly and quarterly statements, stock certificates, bonds, bearer instruments, notes, money market account statements, negotiable orders of withdrawal, account documents, letters of credit, passbooks, drafts, title documents, mortgage and loan documents, property records, storage agreements and bills, storage locker keys, vehicle registration and ownership documents, asset ownership records, journals, ledgers, code sheets, financials, budgets, proposals, plans, contracts, agreements, bills of sale, delivery records, invoices, receipts, documentation of conveyances, deeds, and credit card bills and other papers. These records may be in many forms such as paper, electronic, or in code. I know from my experience that businesses use such software as Quickbooks and Microsoft Money to manage their finances and track their investments.

## ATTACHMENT C
### SDPD PO Todd Jager
Training and Experience On Thermal Imaging

1. San Diego Police Office since December 1986.

2. Assigned to the SDPD Air Unit Since July 1993.

3. Over 3,000 hours experience as a helicopter pilot/tactical flight officer employing the use of airborne FLIR systems.

4. Completed the Advanced Thermal Imaging course conducted by the Airborne Law Enforcement Association in July 1997 and again in July 2001.

5. Taught the Airborne Thermal Imaging and Advanced Thermal Imaging courses and seminars for the Airborne Law Enforcement Association throughout the United States and Canada from July 2002 through July 2006.

6. Received specific training in use of airborne FLIR to assist in indoor marijuana cultivation investigations.

7. Have participated in over 30 airborne FLIR scans of structures suspected in indoor marijuana investigations.